******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JANET MCCALL FLEMING, ADMINISTRATRIX
(ESTATE OF THOMAS C. FLEMING), ET AL.
*v.* GREGORY DIONISIO ET AL.
(SC 19440)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, and Espinosa, Js.*

*Argued April 28—officially released July 14, 2015*

*Joseph M. Busher, Jr.*, for the appellant (named defendant).

*Jeffrey M. Cooper*, for the appellees (plaintiffs).

*Opinion*

ROGERS, C. J. The primary issue in this appeal requires us to resolve whether expert testimony proffered at trial regarding the "crash phase" of withdrawal from stimulant drug use was supported by sufficient scientific methodology to satisfy the standard set forth in *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). The plaintiff, Janet McCall Fleming, brought this action as the administratrix of the estate of Thomas C. Fleming (decedent) and in her individual capacity,[1] seeking to recover damages under six allegations, three on behalf of the decedent and three relating to the plaintiff's own loss of consortium, for injuries resulting in the decedent's death in violation of General Statutes § 52-555.[2] The plaintiff also sought punitive damages under common-law recklessness and under General Statutes § 14-295[3] for the deliberate and reckless operation of a motor vehicle by the named defendant, Gregory Dionisio,[4] in violation of General Statutes §§ 14-218a, 14-222, 14-227a, 14-230 and 14-237. The defendant admitted liability under the plaintiff's negligence claim asserted on behalf of the decedent but contested his liability under the five remaining claims. At the conclusion of the trial, the jury returned a verdict for the plaintiff. The trial court accepted the jury's verdict, denied the defendant's motions to set aside the verdict and for judgment notwithstanding the verdict, and rendered judgment in accordance with the verdict, including an award of compensatory and punitive damages to the decedent's estate and loss of consortium and punitive damages to the plaintiff in her individual capacity. On appeal,[5] the defendant claims that the trial court improperly: (1) admitted expert testimony pertaining to his drug use; (2) precluded the defendant from offering evidence as to the full extent of his criminal punishment related to the accident; (3) admitted evidence of his postaccident conduct, including testimony that he drank his own urine; and (4) failed to strike the plaintiff's testimony that she intended to fund a charitable scholarship and help her daughter. We disagree with each of the claims and, accordingly, affirm the judgment of the trial court.

We begin with a brief overview of the facts, which the jury reasonably could have found, and the procedural history of this case. On the evening of July 3 and into the early morning of July 4, 2009, the defendant consumed approximately six to eight beers, as well as shots of hard alcohol, at his home in Wilton. Three hours after the defendant stopped drinking, at approximately 9 a.m. on Saturday, July 4, he drove approximately twenty minutes to a restaurant in Stamford where he was employed, then worked until approximately midnight on the morning of July 5. Thereafter, between midnight and 3 a.m., the defendant returned home and drank six

to eight more beers. The defendant could not recall his actions between 3 a.m. and 7:30 a.m. on July 5 and his first memory after 3 a.m. was awakening in the driver's seat of his father's vehicle at approximately 7:30 a.m.

Just prior to awakening, the defendant was operating his father's motor vehicle on a roadway approximately two miles from his home, traveling toward the restaurant where he worked. The decedent was operating his motorcycle on the same roadway, traveling in the opposite direction toward the defendant. The defendant's vehicle crossed the center line of the roadway and collided with the decedent's motorcycle, and the decedent died as a result of this collision.

Shortly after the collision, Eva Zimnoch, a police officer for the Wilton Police Department, was called to the scene and spoke to the defendant, whom she observed to have an odor of alcohol and whose pupils she noticed "were very restricted." After Zimnoch spoke with the defendant, he was transported to Norwalk Hospital (hospital). Blood test results indicated that, approximately two hours after the collision, the defendant had a blood alcohol level of 0.09, which is above the legal limit.

While at the hospital, the defendant, upon learning that the decedent had died as a result of the collision, began an internal deliberation of whether he should drink his own urine, which he had excreted into a bedpan and which was designated to be used for a toxicology screening. Around the same time, a nurse entered the defendant's hospital room, observed the defendant begin to drink from the bedpan, and removed the bedpan from the defendant's control. Shortly thereafter, the defendant was to be discharged from the hospital, but he was found to be "difficult to arouse" for discharge instructions. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim on appeal is that the trial court should have precluded the plaintiff's expert testimony because it was comprised of scientific evidence that fell short of the requisite *Porter* standards. We disagree.

The following additional procedural history and facts are relevant to this claim. At trial, the jury was made aware that the defendant had submitted to a urine screen following the collision, which indicated a presence of illicit stimulant drugs and metabolites for stimulant drugs. The jury also learned that the defendant had ingested stimulant drugs in the early morning hours of July 4, 2009. During the trial, the court held a *Porter*-type hearing, at the defendant's request, to determine the admissibility of the plaintiff's expert testimony concerning how the defendant's consumption of an unknown quantity of illicit drugs could have affected

his state of mind at the time of the collision. Specifically, the plaintiff's expert, Michael J. McCabe, Jr., a board certified toxicologist; see footnote 10 of this opinion; proposed to testify that the defendant was in a "crash phase" of withdrawal from ecstasy and cocaine at the time of the collision and that the crash phase was a contributing factor in causing the collision. The defendant challenged the scientific methodology offered in support of McCabe's conclusions.

At the conclusion of the *Porter* hearing, the trial court concluded that McCabe's testimony specifically referring to the defendant's cocaine and ecstasy use two days prior to the collision was prejudicial. The court, however, allowed testimony explaining how consumption of illicit stimulant drugs could ultimately result in a crash phase as being relevant to the issue of whether the defendant had acted recklessly. The court explained that "[t]he stimulant issue is directly related to the crash. To the extent that the defendant brought [this] upon himself . . . according to the expert and according to the plaintiff, this diminished state of awareness and attentiveness and proneness to fatigue and falling asleep and the like . . . is relevant to how and why the accident occurred for purposes of common-law recklessness."

On appeal, the defendant asserts that no reliable methodology supported McCabe's opinion that ingestion of unknown quantities of stimulant drugs two days prior to a collision could result in a crash phase that was a contributing factor to the collision. The defendant claims that the scholarly articles that McCabe relied on were incomplete, irrelevant, and inapposite. The defendant further claims that McCabe's methodology was not generally accepted in the relevant scientific community. In addition, the defendant argues that the underlying methodology of McCabe's testimony did not "fit" the present case because McCabe could not say what quantity of drugs the defendant had consumed, whether the defendant's consumption had any direct impact on the collision, the quantity of drugs required to be found in urine for a positive urine test result, at what point the defendant reached a peak high or when he entered a crash phase, or how long the defendant would remain in a crash phase. The plaintiff responds that McCabe's testimony did not trigger a *Porter* analysis because it did not involve innovative scientific techniques and instead satisfied the traditional test for admissibility applied to all expert testimony. In the alternative, the plaintiff argues that even if McCabe's testimony involved scientific evidence that fell within the parameters of *Porter*, the trial court properly admitted McCabe's testimony because it met the relevant *Porter* factors for scientific reliability and was relevant to the plaintiff's claims that the defendant acted recklessly. We agree with the plaintiff that McCabe's testimony satisfied the relevant *Porter* factors.

We begin with our standard of review. We review a trial court's decision to admit expert testimony for an abuse of discretion. *Weaver* v. *McKnight*, 313 Conn. 393, 405, 97 A.3d 920 (2014). "We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on untenable grounds . . . or involves a clear misconception of the law, we will not disturb its decision. . . . Although we afford trial courts significant discretion, [w]here it clearly appears that an expert witness is qualified to give an opinion, the exclusion of his testimony may be found to be [an abuse of discretion]. . . . To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. . . . If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party." (Citations omitted; internal quotation marks omitted.) Id.; see also Conn. Code Evid. § 7-2.

We next set forth the *Porter* factors that lie at the heart of the defendant's claim.[6] "In *Porter*, we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. *State* v. *Porter*, supra, 241 Conn. 61–66. A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. Id., 63–64. First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. A nonexhaustive list of factors for the court to consider include: general acceptance in the relevant scientific community; whether the methodology underlying the scientific evidence has been tested and subjected to peer review; the known or potential rate of error; the prestige and background of the expert witness supporting the evidence; the extent to which the technique at issue relies [on] subjective judgments made by the expert rather than on objectively verifiable criteria; whether the expert can present and explain the data and methodology underlying the testimony in a manner that assists the jury in drawing conclusions therefrom; and whether the technique or methodology was developed solely for purposes of litigation. . . . *State* v. *Guilbert*, 306 Conn. 218, 231–32, 49 A.3d 705 (2012). Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology. . . .

Id., 232." (Internal quotation marks omitted.) *Weaver* v. *McKnight*, supra, 313 Conn. 413–14.

"Additionally, we recognized in *Porter* that, [t]he actual operation of each [*Porter*] factor, as is the determination of which factors should be considered at all, depends greatly on the specific context of each case in which each particular [threshold admissibility] analysis is conducted. . . . There is, however, a critical postulate that underlies the *Porter* factors and indeed underlies the entire *Porter* analysis: in order for the trial court, in the performance of its role as the gatekeeper for scientific evidence, properly to assess the threshold admissibility of scientific evidence, the proponent of the evidence must provide a sufficient articulation of the methodology underlying the scientific evidence. Without such an articulation, the trial court is entirely ill-equipped to determine if the scientific evidence is reliable upon consideration of the various *Porter* factors. Furthermore, without a clear understanding as to the methodology and its workings, the trial court also cannot properly undertake its analysis under the fit requirement of *Porter*, ensuring that the proffered scientific evidence, in fact, is based upon the reliable methodology articulated." (Citation omitted; internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 180–81, 847 A.2d 978 (2004).

Returning to the present case, we conclude that the trial court properly performed its gatekeeping function and that the decision to allow limited expert testimony regarding the crash phase that follows illicit stimulant drug use was not an abuse of discretion. In reaching this conclusion, we are guided by the noncomprehensive list of factors for reliability and "fit" set forth in *State* v. *Porter*, supra, 241 Conn. 80–90. While these factors are not a checklist that the trial court is required to check off by calculated sequence; see id., 75–76; we are nonetheless persuaded that the evidence analyzed under these factors is adequate to support the trial court's decision. First, with regard to a general acceptance of the methodology, the trial court reasonably could have found that the theory of a crash phase following the consumption of alcohol or use of illicit stimulant drugs, as evidenced by a positive drug test taken after a motor vehicle accident, is generally accepted in the toxicology community.[7] Second, with regard to whether the methodology underlying the scientific evidence has been tested and subjected to peer review, the scholarly articles that McCabe presented described actual peer reviewed tests comparing recreational and chronic stimulant drug users with nonusers.[8] Third, with regard to the known or potential rate of error, McCabe testified that, consistent with the scholarly articles articulating the methodology for assessing the crash phase, predicting driving impairment on the basis of metabolites in a urine screen is very difficult. The articles, however,

described methods to minimize these errors,[9] which McCabe employed in his assessment of this case. Again, we note that the trial court had wide discretion to weigh this factor next to others and we find no abuse of that discretion.

McCabe's testimony also comports with additional reliability factors of *Porter*.[10] As to the extent to which McCabe's technique relied on subjective judgments that he himself made rather than objectively verifiable criteria, McCabe relied on objectively verifiable materials to formulate his conclusion, including police reports and photographs, the deposition of the defendant, the defendant's statement to Geico Insurance, copies of the autopsy report of the decedent, and toxicology reports, which included alcohol and drug results from blood and urine tests of the defendant.

With regard to whether McCabe could assist the jury by presenting and explaining the data and methodology underlying his testimony, McCabe testified extensively at trial regarding toxicological studies of the effects of alcohol and stimulant drugs on human behavior as applied to operating a motor vehicle.[11] We therefore conclude that McCabe's testimony satisfied this *Porter* factor.

Finally, with regard to whether the methodology was developed solely for purposes of litigation, studies addressing the effects of stimulant drug use and alcohol consumption on driving clearly are relevant to societal mores and public policy considerations generally. There is no indication that the research cited by McCabe was conducted for the purpose of litigation rather than for the general advancement of knowledge in this area.

We next consider the second step of *Porter*. With regard to whether the scientific evidence "fit" the present case, we conclude that the methodology that McCabe introduced here fit his conclusion that the defendant was experiencing a crash phase at the time of the collision. The defendant contends that the methodology could not fit the particularities of this case because McCabe based his opinion on an unquantifiable dose of drugs taken at an unspecified time, whereas the reports that McCabe cited all relied upon specific dosage and time markers. We disagree. McCabe explained that he minimized the risk of error by employing recommendations from the articles on which he relied. Specifically, McCabe testified that he based his opinion of the defendant's crash phase in part on the defendant's urine and blood screen results, which showed that the defendant's blood alcohol level was above the legal limit two hours after the collision and that his urine tested positive for illicit stimulant drugs and metabolites. McCabe further relied on the defendant's deposition in which he described his drug and alcohol consumption, work hours, and lack of sleep. McCabe also had notice that the defendant's motor

vehicle crossed the double yellow line into the lane of oncoming traffic, and testified that numerous toxicology studies have concluded that the "behavioral skill of being alert and attentive [and able] . . . to maintain a vehicle in a proper lane is impaired at levels of alcohol intoxication such as those found in [the defendant]." We reiterate that the purpose of the *Porter* hearing is to ascertain the *validity*, not the *weight*, of the methodology underlying the proffered scientific evidence. *State* v. *Porter*, supra, 241 Conn. 81–83. We conclude that the trial court did not abuse its discretion in finding that the scientific methodology underlying McCabe's testimony was valid and that a jury should be allowed to consider that testimony and decide what weight to give it. See id.

## II

We further conclude that the defendant's remaining claims were properly decided by the trial court and are without merit. The trial court's decision to admit or preclude evidence, and its determination as to whether evidence is relevant and probative, are subject to review for an abuse of discretion. See *Reville* v. *Reville*, 312 Conn. 428, 461, 93 A.3d 1076 (2014); *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007); Conn. Code Evid. § 4-1.

The defendant claims that the trial court improperly refused to admit into evidence the particularities of the defendant's criminal probation arising from the collision,[12] which he argues are relevant to mitigate against an award of § 14-295 and common-law punitive damages. We disagree. The trial court correctly concluded that, while evidence of criminal penalties could be admissible, admitting such evidence was within the court's discretion. The court reasoned that the plaintiff sought a civil penalty that provided a remedy to private litigants. We cannot say that the trial court abused its discretion by limiting the defendant from cross-examining the plaintiff on the specific conditions of the defendant's probation, particularly since that was not a subject about which the plaintiff had personal knowledge. See *State* v. *Saucier*, supra, 283 Conn. 218–19. We further find no abuse of discretion in the court's decision to preclude the defendant from testifying about the specific terms of his probation when his prison sentence, probation, and apology were already before the jury, and the court reasonably was reluctant to further delay trial proceedings by allowing him to return to the stand to address a peripheral matter.

The defendant next claims that the trial court improperly admitted evidence of his conduct and his condition in the hospital following the accident.[13] The defendant argues that this evidence was unduly prejudicial to him, and that its probative value was outweighed by this prejudice. The plaintiff responds that this evidence clearly was relevant to the defendant's consciousness of liability and is permissible under our case law. She

further contends that the defendant was allowed ample opportunity to mitigate the impact of the evidence by providing reasonable explanations for his conduct. We agree with the plaintiff.

With regard to the defendant's attempt to drink his own urine, "[s]ubsequent conduct may, in many cases, be given in evidence to affect or to show the character of prior acts or intentions. . . . Conduct of a litigant which is plainly reprehensible, such as the intimidation of a witness or flight from the scene of an accident, has commonly been admitted to show consciousness of a doubtful cause." (Citation omitted; internal quotation marks omitted.) *Batick* v. *Seymour*, 186 Conn. 632, 636, 443 A.2d 471 (1982). In addition, the defendant's inappropriate speech and difficulty in being roused were relevant to whether he was still intoxicated or fatigued. See *Reville* v. *Reville*, supra, 312 Conn. 461. We conclude that the evidence was clearly relevant and that its probative value was not outweighed by its prejudicial impact, especially where the defendant was given an opportunity to explain his actions.

The defendant's final claim is that the trial court improperly refused to strike the plaintiff's testimony regarding her future plans following the decedent's death because it was irrelevant and prejudicial and described the plaintiff's intentions for damages she expected to receive from this case.[14] We disagree. The plaintiff's response did not specifically reference any potential award she might receive from the resolution of this case, and her answers were generically appropriate. In any event, the trial court, "in an excess of caution," gave a curative instruction to the jury to disregard the plaintiff's future plans when they considered whether to award her damages.

The judgment is affirmed.

In this opinion the other justices concurred.

* This case was originally scheduled to be argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Zarella, Eveleigh, McDonald and Espinosa. Although Chief Justice Rogers was not present when the case was argued before the court, she read the briefs and appendices and listened to a recording of the oral argument prior to participating in this decision.

[1] References to the plaintiff herein are to her in both capacities.

[2] General Statutes § 52-555 (a) provides in relevant part: "In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses . . . ."

[3] General Statutes § 14-295 provides in relevant part: "In any civil action to recover damages resulting from personal injury, wrongful death or damage to property, the trier of fact may award double or treble damages if the injured party has specifically pleaded that another party has deliberately or with reckless disregard operated a motor vehicle in violation of section 14-218a . . . 14-222, 14-227a, 14-230 . . . [or] 14-237 . . . and that such violation was a substantial factor in causing such injury, [or] death . . . ."

[4] John A. Dionisio, who owned the vehicle Gregory Dionisio was operating at the time of the accident, also was named as a defendant. The action was subsequently withdrawn as against him. References herein to the defendant are to Gregory Dionisio only.

[5] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] We note that "a *Porter* analysis is separate from our test used to determine whether a witness is qualified to give expert testimony. . . . [A]ll expert witnesses must be qualified to present expert testimony on a particular subject. To establish qualifications, the party presenting an expert witness must show that the witness has special knowledge or skills, not common to the average person, that would be helpful to the fact finder in resolving an issue in the case. See, e.g., *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986), overruled in part on other grounds by *State* v. *Guilbert*, [306 Conn. 218, 226, 49 A.3d 705 (2012)]. A *Porter* analysis, however, is a 'further hurdle,' beyond the general qualification requirements, for admitting expert testimony based on 'scientific' evidence and methods. See *State* v. *Guilbert*, supra, 230–31. Rather than assessing a witness' *qualifications* (i.e., his knowledge and experience), a *Porter* analysis assesses the witness' *methods* (i.e., his reasoning and procedures) used to reach his conclusions. An expert might be qualified to discuss a particular topic, but nevertheless have his opinion excluded because the methods he used to reach that opinion were unreliable." (Emphasis in original.) *Weaver* v. *McKnight*, supra, 313 Conn. 414–15. In this case the defendant does not challenge the expert's qualifications but does challenge his methodology.

[7] McCabe offered four articles and a presentation published in nationwide and international scientific journals. One article noted that "[a] crash phase after heavy, chronic cocaine use has certainly been well documented." D. Isenschmid, "Cocaine—Effects on Human Performance and Behavior," 14 Forensic Sci. Rev. 61, 91 (January 2002).

[8] McCabe testified that the crash phase following the use of stimulant drugs has been studied in the field of toxicology and that these studies have been subjected to peer review. For example, McCabe explained the methodology of one study that involved four groups of individuals: one group was the control in which the individuals were neither sleep deprived nor had they ingested any stimulant drugs; the second group was only sleep deprived; the third group had only ingested a stimulant drug; and the fourth group had ingested a stimulant drug and was sleep deprived. Their driving was studied and driving performance was measured with a lane drift rubric. McCabe offered another example, which was a peer reviewed article from the Journal of Forensic Science Review. See B. Logan, "Methamphetamine Effect on Human Performance and Behavior," 14 Forensic Sci. Rev. 133 (January 2002). Logan's article was based on a study of binge methamphetamine users. McCabe testified that the study revealed that, after a stimulant wears off, depending on the duration of the binge, the user experiences a "crash characterized by lengthy nonrestful sleep, which may last a day or more. . . . [E]ventually the user becomes so tired and fatigued . . . that they may nod off to sleep, and  . . . then start [to experience] dysphoria, fatigue, inertia and [an]hedonia, meaning a lack of ability to experience pleasure, and exhaustion." See B. Logan, supra, 142. McCabe also testified that methamphetamine is a drug related to ecstasy.

[9] See D. Isenschmid, "Cocaine—Effects on Human Performance and Behavior," 14 Forensic Sci. Rev. 61, 92 (January 2002) ("In all, the current data suggests that it is very difficult to predict driving impairment on the basis of the presence of cocaine and/or metabolites in biological specimens. Eyewitnessed driving behavior, coupled with laboratory studies and examination by a drug recognition examiner, is the triad that, currently, appears to best determine driving impairment.").

[10] With regard to the prestige and background of the expert witness supporting the evidence, McCabe's background demonstrated an undisputedly comprehensive training and practice in toxicology. McCabe, who holds a Ph.D in immunology from Albany Medical College, is board certified as a toxicologist as a diplomat of the American Board of Toxicology and by the Academy of Toxicological Sciences, and is an adjunct associate professor of toxicology at the University of Rochester Medical Center. At the time of the trial, McCabe was a toxicologist at an expert witness and consulting firm. As a toxicologist, McCabe studied the effects of fatigue and alcohol and stimulant drug use on a driver's ability to operate a vehicle. McCabe also conducted research in toxicology in Sweden as a postdoctoral fellow at the Karolinska Institute of Environmental Medicine. McCabe testified at trial that he was taking two to three continuing education courses every year, and during the years immediately preceding his testimony, McCabe took courses that specifically addressed the effects of alcohol or drugs on

human performance.

[11] For example, McCabe testified that "[my opinion is that empirical studies are applicable to the task of driving, and my opinion is] supported by the scientific literature . . . in that driving is a divided attention task. . . . We all [drive] every day. But it's a skill that requires various behaviors: our ability to remain attentive, to be alert, to have appropriate reaction time, to have appropriate what we call executive function, meaning we plan out the route that we're going to take. We do it before we leave the house. We do it while we're [e]n route."

McCabe further testified that "[n]umerous toxicology studies have shown that under this behavioral skill of being alert and attentive that vigilance and ability to maintain a vehicle in a proper lane is impaired at levels of alcohol intoxication such as those found in [the defendant]. [There are] numerous studies that have shown this. I . . . spoke earlier about a study from a . . . Netherlands group that had established standard testing protocols for . . . measuring how much vehicles deviate. . . . [T]hese are in . . . intoxicated driver's studies. How much a . . . driver deviates as a function of her blood-alcohol concentration . . . has been well documented, well studied in the scientific toxicology literature and ascribed to levels of impairment [or] intoxication."

[12] Specifically, the defendant asserts in his brief that the trial court improperly disallowed evidence that: he was not permitted to drive during his probationary period unless the probation department, rather than the Department of Motor Vehicles, determined that he was ready to drive; he had to complete 100 hours of community service during each year of his probation; there would be an ignition interlock device installed in his motor vehicle in the event that he was permitted to drive; and any motor vehicle violation would constitute a violation of probation triggering his return to prison.

[13] At trial, Laurie Nolan-Kelley, a nurse in the emergency department at the hospital who treated the defendant following the collision, testified that she found the defendant drinking from the urinal that she had placed in his hospital room. Nolan-Kelley testified that the defendant thereafter resisted giving her the urinal, but that she was able to retrieve it and withdraw samples for drug screens therefrom. The defendant testified to explain his conduct: "I was informed . . . that the motorcyclist, who I later found out to be [the decedent], was dead. And I was afraid, I knew I had been drinking earlier in the evening and I was in the process of making the rash decision to drink my urine when the nurse walked in and grabbed the bedpan from me." In addition, both Nolan-Kelley and Philip Sundberg, an emergency room physician who treated the defendant following the collision, testified that the defendant was difficult to arouse at the time he was to be given discharge instructions and that his speech was inappropriate.

[14] When the plaintiff took the witness stand, her counsel asked her, "[w]here do you see now, in terms of where your life is going now that [the decedent is] not in it anymore?" The plaintiff replied that she planned to continue working at the preschool at which she was currently employed, to help her daughter and to continue the scholarship fund established in the decedent's name.